UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES HOSKINS, | ) |
| Plaintiff, | ) |
| | ) No. 16 C 8479 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| CHIEF PETER GREEN, in his individual capacity and VILLAGE OF PARK FOREST, | ) |
| Defendants. | ) |

## OPINION AND ORDER

After losing his job to what he believes is retaliation, Charles Hoskins brings this two-count retaliation suit against his former employer, the Village of Park Forest ("the Village"), and the Village's police chief, Peter Green pursuant to 42 U.S.C. §1983. Hoskins claims that Chief Green terminated his employment in retaliation for engaging in protected First Amendment speech. He also brings a common law retaliatory discharge claim against the Village. After the close of fact discovery, Defendants filed a motion for summary judgment. The Court finds that Defendants are entitled to summary judgment on both counts because Hoskins did not engage in protected speech.

## BACKGROUND[1]

Hoskins began his employment as a police officer with the Village on January 2, 2006. Throughout his tenure, Hoskins' disciplinary history included eleven specific incidents, twenty-

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and Hoskins' Additional Facts. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Hoskins, the non-movant.

three formal counseling sessions, and numerous informal counseling sessions. His disciplinary history included discipline for fabrication of information. Defendants terminated Hoskins' employment on November 5, 2015.

As a patrol officer, Hoskins had several duties, including the duty to intercede and report in cases where he witnessed another officer using excessive force. Hoskins knew that even if the individual involved in the use of force was a commanding officer, he could go around that commanding officer and up the chain of command to fulfill his duty to report the improper conduct. Hoskins also had a duty to prepare written reports about calls or incidents to which he responded that were complete, accurate, and truthful. This duty required Hoskins not to suppress, conceal, or distort the facts of any reported incident.

Prior to August 24, 2015, Hoskins was one of several members of the Village police department named as an individual defendant to a pending lawsuit filed by the family of John Wrana. During that litigation, the Village had to retain special counsel for Hoskins based upon his disciplinary history, which included exaggerations, fabrications, omissions, and issues with the general trustworthiness of his reporting.

On August 24, just after midnight, Hoskins conducted a traffic stop of a blue Buick sedan after witnessing the sedan and another vehicle engaged in a high-speed chase. After the sedan pulled over, Hoskins approached and observed three passengers inside: a male driver, a woman later identified as Latoya Wilson, and another male passenger. Commander Baugh and Officer Biltgen subsequently arrived at the scene. Hoskins removed the driver from the car and secured him in Hoskins' patrol car without incident. Biltgen approached the passenger side of the sedan, at which time Wilson dropped an empty bottle of Hennessy out of the passenger side door and

acknowledged to Biltgen that the bottle belonged to her. Biltgen then removed Wilson from the sedan, placed her under arrest, and handcuffed her.

Wilson was both verbally and physically resisting at the time of her arrest. Hoskins observed that Wilson was highly intoxicated and argumentative. He and Baugh walked Wilson to Baugh's car where they attempted to place Wilson in the back seat. Once they placed Wilson in Baugh's car, she began kicking the windows. Because Hoskins' car had bars on the back of it, Baugh decided to transfer Wilson from his car to Hoskins'. He removed Wilson from his car, by which point she had become highly agitated and somewhat combative. Hoskins then assisted Baugh in walking Wilson over to his car. Once there, Wilson refused to get in and began screaming and cursing at the officers. She became increasingly combative against Baugh's efforts to get her legs into the car and started kicking Baugh in the chest or shoulder area, and the head. Wilson also began to try to bite Baugh. Hoskins and Biltgen told Baugh that they should use a taser to subdue Wilson. Wilson's combative efforts continued, at which point Baugh struck Wilson's neck with his palm to stop her from trying to bite him. Biltgen testified that the strike was purely defensive, that Baugh did not choke Wilson, and that Baugh did not maintain contact with Wilson's neck. He believed that the strike was appropriate and necessary under the circumstances of Wilson's repeated attempts to bite Baugh. Following this, Hoskins used his taser to subdue Wilson. The officers eventually secured Wilson in Hoskins' patrol car.

On August 25, the Village charged Wilson with one count of Aggravated Battery of a Peace Officer for her conduct during the traffic stop. A sworn statement from Wilson supported the charge, wherein she acknowledged kicking her legs wildly at the officers involved in the stop. In her sworn statement, she did not claim that she was excessively handled or mistreated by Baugh and took responsibility for her conduct during her arrest. Wilson pled guilty to a

3

reduced charge and never filed a complaint alleging excessive force by Baugh or that anything improper occurred during the traffic stop.

Hoskins prepared a written report and a taser report for the Wilson traffic stop during the evening of August 24. He prepared the report based on his memory of the incident and did not review the I-Cop video and audio of the traffic stop. Hoskins' report did not include anything regarding Baugh's use of force during the Wilson traffic stop. Green, the Village police chief, first became aware of the incident when he learned from Deputy Chief Mannino on the following day that Hoskins made an arrest and that Mannino had discovered inaccuracies and omissions in Hoskins' report. Mannino advised Green that he was requesting a meeting with Hoskins and Baugh to determine why there were discrepancies and omissions in the report. On August 26, Hoskins and Mannino had a meeting to go over the reports. During the meeting, Mannino identified several problems with Hoskins' report based on Mannino's own review of the I-Cop video of the incident and the taser device information, including that Hoskins had misquoted a conversation that occurred during the stop. At no point during the meeting did Hoskins advise Mannino of his claims regarding Baugh's use of force during the Wilson traffic stop. Mannino emphasized the importance of correct and accurate reporting, especially considering the pending Wrana lawsuit against the Village and Hoskins. Hoskins indicated that he would correct the issues with the report, so he watched the I-Cop video of the Wilson arrest and submitted a revised report. The revised report still did not include any information regarding Baugh's use of force. Hoskins did not report or mention his claims regarding Baugh's use of force to anyone up the chain of command at the police department during the three days between the Wilson traffic stop in the early morning of August 24 and the evening of August 27. He admits that he never

4

reported Baugh's alleged excessive force even though he knew that if he believed Baugh used excessive force then he had a duty to report under department policy.

During Hoskins' shift on the evening of August 27, he requested that fellow Officer Jachymiak have a car-to-car conversation with him. Hoskins and Jachymiak met for the conversation, which Hoskins intended to be private. Hoskins sought Jachymiak's advice as to whether he should report his claim that Baugh handled Wilson excessively during the August 24 traffic stop. Jachymiak recalled that Hoskins stated during the conversation that he believed Baugh had mishandled Wilson, that what he saw was "bad," that he had tasered Wilson, that he was upset that Mannino had asked him to correct the inaccuracies Mannino found during his review of Hoskins' report, and that Hoskins was personally concerned about covering himself because he was already involved as a defendant in another lawsuit. Doc. 53 ¶ 40. While Hoskins was making these comments to Jachymiak, he accidentally keyed the radio in his vehicle with his leg and started broadcasting his comments on the police department's side band, "Band 2." Hoskins discovered he was accidentally broadcasting his private conversation with Jachymiak when Deputy Chief Winfrey said something over the radio to let him know he had keyed his radio.

One of Hoskins' job duties is to speak out about and report both crimes and potential crimes. This includes speaking to fellow officers about potential crimes, and Hoskins admits that conversations such as the one between himself and Jachymiak were "part of the job." *Id.* ¶ 42. Hoskins' conversation with Jachymiak "was within the context of his role as a police officer for the Village." Doc. 53 ¶ 43; Doc. 60 ¶ 43. Hoskins did not talk to Jachymiak with the intention that Jachymiak would report what Hoskins claimed Baugh had done during the Wilson traffic stop. He instead sought Jachymiak's advice about what he, himself, should do. Hoskins did not

5

consider his conversation to be one reporting a crime, and he never asked Jachymiak to report the incident or take any action in response to his comments. Following the accidental broadcast, Deputy Chief Winfrey asked Hoskins to return to the police department, and subsequently sent Hoskins home for the rest of his shift.

Green did not hear the Band 2 conversation as it occurred. However, Mannino advised him of the incident and summarized generally what Hoskins said. Green recalled learning that Hoskins was ranting to Jachymiak regarding Mannino's conversation with Hoskins and Hoskins' need to revise the incident reports from the Wilson traffic stop, that Hoskins called Wilson a "bitch" during the conversation, and that Hoskins made allegations that Baugh had "choked that bitch out," and was "throwing that bitch around." Doc. 53 ¶ 48. Mannino advised Green that Hoskins' claims in the Band 2 conversation were inconsistent with the reports Hoskins prepared regarding the Wilson traffic stop. Green directed Mannino to open two investigations: (1) an investigation into Hoskins' statements and conduct regarding the Wilson incident, and (2) an investigation into Hoskins' excessive force allegations against Baugh. If Hoskins' claims were true, Baugh could be subject to discipline for his alleged conduct and Hoskins could be subject to discipline for his failure to report, and if Hoskins' claims were false, Hoskins could be subject to discipline for fabrication or gross exaggeration.

As part of his investigation, Mannino requested a written report from Jachymiak and Biltgen, and he formally interrogated Baugh and Hoskins. Biltgen's report detailed his recollection of the Wilson traffic stop, including Wilson's highly intoxicated and combative nature. It referenced Baugh dropping Wilson while pulling her from Baugh's car, but did not include any claims of Baugh choking Wilson or dragging her around on the ground after being placed in Hoskins' patrol car. During Hoskins' interrogation, he reiterated his claims that Baugh

had engaged in an improper use of force, including that Baugh choked Wilson, that he pulled her out of Hoskins' car by her throat and arm, and subsequently dragged Wilson around on the ground after Hoskins tasered her. Hoskins testified that he had a duty to report his allegations but that he did not do so until questioned. During Baugh's interrogation, he indicated that he defensively pushed Wilson back by her throat with his thumb and forefinger in a V shape as she tried to bite him in the back seat of Hoskins' car, but denied pulling Wilson out of Hoskins' car, wrestling or fighting with her on the ground at any time, and removing her from Hoskins' car after placing her there. Baugh admitted he pulled Wilson out of his own car by her ankles, which resulted in her falling to the ground. Biltgen indicated to Mannino that he had witnessed Baugh hold Wilson back by her throat as she tried to bite him, and that it was a "reasonable and necessary defensive move" under the circumstances. Doc 53 ¶ 56. Biltgen further told Mannino that he witnessed Baugh pull Wilson out of Baugh's car and that he witnessed her falling to the ground before Baugh assisted her in getting up and walked her over to Hoskins' patrol car. Biltgen also reviewed Hoskins' interrogation transcript. Based on his observations during the incident, Biltgen advised Mannino that Hoskins' testimony that Baugh removed Wilson from Hoskins' car and dragged or slung her around on the ground during the incident was untrue. Biltgen confirmed that he had the same vantage point as Hoskins during the incident.

As part of the investigation, Mannino also reviewed the in-car videos from the Wilson incident, which indicated that Wilson was verbally non-compliant throughout the encounter, and that officers gave her numerous orders to stop resisting, to get in the car, and to stop kicking. Mannino indicated in his investigation report that based on his review of the video, Hoskins misquoted himself in his report of the incident and stated that he gave a verbal warning of the taser application to the driver of the sedan, Courtney Bennett, when Mannino heard no such

7

warning in the video. Mannino's report also noted that Hoskins' initial incident report omitted the second application of the taser to Wilson and failed to note if he provided her with a verbal warning prior to tasing her. Mannino's report indicated that, in the period between the Wilson traffic stop on August 24 and the Band 2 conversation on August 27, Hoskins failed to report his perceptions of excessive force to a supervisor verbally, in his initial report, or in his amended report. Mannino's report also stated there was a difference of opinion among Hoskins, Baugh, and Biltgen, as to whether Baugh's conduct in making contact with Wilson's neck while she attempted to bite him during the incident was reasonable and necessary or excessive, but that if Hoskins perceived the conduct as excessive he had a duty to report. Further, the report noted that Hoskins admitted in his formal interrogation that he was aware of his duty to intercede and report Baugh's use of force if it was as alleged, and that he failed to either intercede or report. Mannino's report also concluded that Hoskins' use of the term "choked the bitch out" regarding the contact was a gross exaggeration of the conduct even as described by Hoskins during his formal interrogation. When compared to the video and audio from the I-Cop camera system, Mannino's report concluded that Hoskins gave several inaccurate statements during his formal interrogation, such as who originally removed Wilson from the sedan, and the amount and timing of resistance from Wilson while attempting to get her into Hoskins' car, and that these inaccuracies negatively impacted Hoskins' general credibility. Mannino's review of the audio and video from the I-Cop camera system simply did not support Hoskins' account of events. Based on his investigation, Mannino concluded that Hoskins had violated several department policies including: (1) Policy 300.2.1 Duty to Intercede; (2) Policy 323.1.1 Report Preparation; (3) Policy 320.3.2 Conduct; and (4) Policy 320.3.5 Performance.

Following Mannino's report, Green brought three formal charges against Hoskins. On October 21, 2015, Green served Hoskins his charges including: (a) false and/or reckless charges against Officer Doe (Baugh); (b) failure to report potential misconduct of a fellow Officer; and (c) failure to properly report. These charges were consistent with and based upon the policy violations found in Mannino's investigation. In making this decision, Green relied upon: (1) Mannino's investigation, report, and the recommendations therein; (2) multiple witness interviews as reflected in Mannino's report; (3) his review of the squad car video and audio; (4) his review of memoranda of various officers regarding the incidents; (5) the police reports prepared regarding the Wilson traffic stop and the conduct therein; (6) his review of the audio of the Band 2 conversation; (7) his review of Hoskins' and Baugh's formal interrogation testimony; (8) his review of Wilson's sworn statement regarding the August 24 traffic stop; (9) his review of the video of Wilson in jail after she was arrested, which revealed that Wilson was highly intoxicated and agitated, verbally resistant, and causing a scene; (10) his review of Hoskins' personnel file including disciplinary histories and any commendations, as well as performance evaluations. Green did not terminate Hoskins for engaging in the conversation he had with Jachymiak broadcast over Band 2; rather, in addition to considering Hoskins' employment history, Green terminated Hoskins because he never reported the allegations he made during the conversation, in violation of department policies, and because Mannino's investigation determined the allegations to be completely unfounded. Doc. 53 ¶ 76; Doc. 60 ¶ 76. Even if the claims had been true, Green would have terminated Hoskins for his reporting failures when Hoskins failed to report Baugh's use of force among other various reporting deficiencies that Mannino's report detailed. Green also found that Hoskins' discussion with Jachymiak did not comply with department policy for reporting excessive force conduct since Jachymiak was a

9

junior officer with only two years of experience. Department policy required that Hoskins promptly report any excessive conduct to a supervisor.

Green terminated Hoskins' employment on November 5, 2015 based on the charges issued in October 2015. The Village Board of Trustees approved Hoskins' termination. Hoskins' labor union took his termination to arbitration, and the arbitrator affirmed his termination.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I. Hoskins' Retaliation Claim against Green

Hoskins alleges that Green terminated his employment in retaliation for remarks made during his conversation with Jachymiak in violation of Hoskins' First Amendment right to free speech. "To establish a claim for retaliation in violation of the First Amendment, a public employee must first prove that [his] speech is constitutionally protected." *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016). To prove that his speech is protected under the First Amendment, a public employee must establish: (1) that he spoke as a private citizen, (2) about a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). Whether speech is constitutionally protected is a matter of law. *Kubiak*, 810 F.3d at 481.

#### A. Speech as a Private Citizen

To show that his conversation with Jachymiak on August 27, 2015 is constitutionally protected, Hoskins must show that he spoke as a citizen, not as a public officer. *Garcetti*, 547 U.S. at 418. "When public employees make statements pursuant to their official duties, the employees are not speaking as private citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform and is not limited to the formal job description." *Kubiak*, 810 F.3d at 481 (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)).

The Seventh Circuit has consistently found that reporting official police misconduct is part of a police officer's official duties. *See Roake v. Forest Pres. Dist. of Cook Cty.*, 849 F.3d 342, 346 (7th Cir. 2017); *Kubiak*, 810 F.3d at 481–82; *Vose v. Kliment*, 506 F.3d 565, 571 (7th

Cir. 2007). However, Hoskins contends that the conversation was not an official report of misconduct because Jachymiak was a junior officer and Hoskins had a duty to report to a supervisor. In Hoskins' own words, he was "seeking advice about how to proceed" regarding Baugh's excessive force. Doc. 59 at 2. Hoskins does not explain how seeking advice about how and whether to report is sufficiently different from reporting such that the speech in question would not be part and parcel of his job duties. *Kubiak*, 810 F.3d at 482 ("Our conclusion that Kubiak spoke as an employee is further supported by the fact that her speech was intimately connected with her job."). In fact, by his own admission, the conversation with Jachymiak was "part of the job." Doc. 53 ¶ 42 ("Plaintiff admits conversations such as the one between Plaintiff and Officer Jachymiak on August 27 were 'part of the job.'"). The parties also agree that "Plaintiff's conversation with Officer Jachymiak was within the context of his role as a police officer for the Village." *Id.* ¶ 43. The Court finds no argument from Hoskins that addresses these admissions. The Court therefore finds that the statements Hoskins made during a conversation that was "part of the job" and "within the context of the role of a police officer" are statements made pursuant to and intimately connected with a police officer's duties. *Id.*; *See Kubiak*, 810 F.3d at 482. In engaging in the conversation with Jachymiak, the Court finds that Hoskins spoke as a public employee and not a private citizen.

B.  **Speech as a Matter of Public Concern**

The second prong in *Garcetti* requires Hoskins to show that the allegedly protected speech addresses a matter of public concern. 547 U.S. at 418. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). "The *Connick* test requires [the Court] to look at the overall objective or point of the

speech, as ascertained by those three factors." *Kubiak*, 810 F.3d at 483. While content is the most important factor, the general subject matter of the speech is not determinative. *Id.* Similarly, the motive of the speaker is relevant as context but is not dispositive. *Id.* "In sum, [the Court must] ask whether the object of the speech—as determined by content, form, and context—was to 'bring wrongdoing to light' or to 'further some purely private interest.'" *Id.* (citing *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 985 (7th Cir. 2013)).

Between those two ends of the spectrum, the Court finds that Hoskins' conversation with Jachymiak was closer to furthering some purely private interest than to bringing wrongdoing to light. The parties agree that Hoskins did not talk to Jachymiak with the intention that Jachymiak would report what Hoskins claimed Baugh had done during the Wilson traffic stop; rather, Hoskins was seeking advice from Jachymiak. Jachymiak testified that he believed Hoskins was just "venting" during their conversation. Doc. 53 ¶ 46. Furthermore, Hoskins argues that this was the speech of private citizen and that he was not reporting Baugh's alleged misconduct, which undermines any claim that it touched on a matter of public concern. Despite the lack of reporting, Hoskins argues that the conversation related to a community concern regarding the alleged excessive force used by Baugh. "However, when analyzing the content of the speech, the broad subject matter is not determinative, and we must instead focus on the particular content of the speech." *Kubiak*, 810 F.3d at 483. The particular content of the speech in this case contained venting by Hoskins regarding the Wrana lawsuit and Mannino's request that Hoskins revise his report to more accurately comport with the I-Car video and audio in equal part with Hoskins' allegations against Baugh. Doc. 53 ¶ 40. The form, a private car to car conversation, also suggests that the speech concerned was a private issue and not a matter of public concern. *Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) ("Although the fact that the speech was

13

entirely internal does not itself render the speech unprotected, this fact does suggest that the grievance was personal in nature."). Finally, this conversation arose in the context of Mannino's request for Hoskins to revise his report. This fact suggests that Hoskins intended more to air a private grievance than to bring wrongdoing to light. *Kubiak*, 810 F.3d at 483–84 (finding that a report of misconduct arising from a confrontation at work indicated that the speech concerned a private issue). Therefore, the Court finds that the content, form, and context of Hoskins' speech did not sufficiently address a matter of public concern.

Because Hoskins did not speak as a private citizen nor address a matter of public concern, he did not engage in protected speech and his retaliation claim against Green fails.

## II. Hoskins' Retaliatory Discharge Claim against the Village

Hoskins alleges that the Village terminated his employment in retaliation for reporting a crime or potential crime in violation of Illinois public policy. The Illinois Supreme Court has held that the tort of retaliatory discharge extends to cover whistleblowers fired because of their whistleblowing. *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879, 85 Ill. 2d 124, 52 Ill. Dec. 13 (1981) (finding that an employee stated a cause of action for retaliatory discharge when he was fired for reporting alleged crimes of his employer to law enforcement). To establish a claim for retaliatory discharge, therefore, Hoskins must allege that: (1) he was discharged, (2) his discharge was in retaliation for legally-protected activities, and (3) his discharge contravened a clearly-mandated public policy of the State of Illinois. *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) (citing *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728, 151 Ill. 2d 142, 176 Ill. Dec. 22 (1992)). The Court finds that Hoskins is unable to establish such a claim on this record as a matter of law.

As discussed above, Hoskins did not engage in legally-protected speech during his conversation with Jachymiak. Furthermore, under Illinois law, "the intent of the employee to blow the whistle is vital to a claim of retaliatory discharge." *Michael v. Precision Alliance Grp., LLC*, 952 N.E.2d 682, 688, 2011 IL App(5th) 10089, 351 Ill. Dec. 890 (2011). Hoskins is adamant that he was not "reporting" during his conversation with Jachymiak and further admits that the broadcast to Band 2 was accidental. By his own admission, Hoskins did not intend to blow the whistle: "Plaintiff did not consider his conversation with Officer Jachymiak to be one where Plaintiff was reporting a crime to Officer Jachymiak. . . . If Plaintiff had intended to report Commander Baugh's conduct as a crime, Plaintiff would have gone up the chain of command with that report." Doc. 53 ¶¶ 44–45.

Hoskins argues that this case is analogous to *Palmateer*, where the Illinois Supreme Court found that an employee who was fired for reporting alleged crimes of his employer to the authorities had stated a case for retaliatory discharge. *Palmateer*, 421 N.E.2d, at 879. Hoskins ignores the critical fact that Palmateer was not a police officer himself. When Palmateer reported the allegedly criminal activity, it did not matter to whom in the police department he reported the activity. Hoskins' situation is fundamentally different. When Hoskins spoke to Jachymiak, he spoke down the chain of command or authority, not up the chain of command as he knew he should if he intended to report. Hoskins cites no other authority to cure the fatal flaw that his own admissions create in his retaliatory discharge claim against the Village. Therefore, the Court finds that Hoskins cannot establish that he engaged in protected speech or intented to blow the whistle when speaking to Jachymiak, and the Court grants summary judgment to the Village on this claim.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [50]. The Court enters judgment for Defendants on Hoskins' first amended complaint and terminates this case.

Dated: February 26, 2019

_____
SARA L. ELLIS
United States District Judge